| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO: 3:09-1169-CMC |
| | ) | |
| vs. | ) | |
| | ) | |
| NANCY ELIZABETH DYAL | ) | |
| SHERI M HUTTO | ) | |
| WAYNE HUGH HUTTO | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | CR. NO: 3:09-1174-CMC |
| | ) | |
| vs. | ) | |
| | ) | |
| LESLIE WAYNE PEELER | ) | |
| SCOTT EDWARD LAWSON | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | CR. NO:3:09-1295-CMC |
| | ) | |
| vs. | ) | |
| | ) | |
| JAMES MORROW COLLINS, JR | ) | |
| _____ | ) | |

## INTRODUCTION

These three related actions were tried together beginning with jury selection on April 29, 2010, and ending with the return of verdicts on May 7, 2010. All Defendants were found guilty on all charges. The actions are now before the court on Defendants' alternative motions for judgment of acquittal or a new trial.[1]

---

[1] Unlike the other Defendants, James Morrow Collins, Jr. ("Collins") filed only a motion for a new trial. However, because that motion includes an argument based on insufficiency of the evidence, the court will assume for purposes of this order that Collins also seeks acquittal

In support of their motions for judgment of acquittal, Defendants argue that the evidence against them was insufficient in various respects. In the alternative, Defendants argue that the trial was tainted by juror misconduct, thus entitling them to a new trial.

The court has carefully considered the arguments of all Defendants as well as the Government's responsive memoranda. In considering the defense arguments, the court has assumed that all arguments are made on behalf of all Defendants to whom the argument might apply. Having completed this review, the court concludes, first, that the evidence was sufficient to sustain the convictions and, second, that although there was juror misconduct, that misconduct was not prejudicial to any Defendant. The court finds Defendants' related and additional arguments to be without merit. The court, therefore, denies all motions for judgment of acquittal or a new trial.

## DISCUSSION

## I.    MOTIONS FOR JUDGMENT OF ACQUITTAL (SUFFICIENCY OF EVIDENCE)

### A.    Standard

Rule 29 of the Federal Rules of Criminal Procedure provides that a court may enter a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A defendant challenging the sufficiency of the evidence faces a heavy burden," *United States v. Foster*, 507 F.3d 233, 245 (4th Cir. 2007), as "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support [the convictions]." *United States v. Cameron*, 573 F.3d 179, 183 (4th Cir. 2009) (internal quotation and citation omitted). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id*. Moreover, "if the record reflects that the Government presented substantial

evidence from which a reasonable jury could convict, [the court] must uphold the verdict." *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006) (quotation and citation omitted). Thus, a court must sustain the jury's verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Myers*, 280 F.3d 407, 415 (4th Cir. 2002). In making this determination, a court considers both direct and circumstantial evidence, allowing "the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). The court does not review the credibility of the witnesses and should assume that the jury resolved all contradictions in the testimony in favor of the Government. *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998).

### B. Challenges to Sufficiency

Defendants challenge the sufficiency of the evidence in various respects. Most critically, they argue that there was no evidence that: (1) some of them sponsored or exhibited animals or aided and abetted others in the same activities; (2) the events or ventures at issue were in or affecting interstate commerce; (3) the events or ventures at issue were for the purpose of sport, wagering, or entertainment; or (4) those charged with gambling offenses conducted any illegal gambling activity. As to the last issue, one or more Defendants also argue that the court erred in not requiring proof that any illegal gambling activity was conducted both willfully and knowingly. *See* 3:09-cr-1295 (Collins) Dkt. No. 179 at 6-7.

### C. Sufficiency of Evidence

The arguments as to sufficiency are similar to those presented during trial at the conclusion of the Government's case. The court carefully considered the evidence at that stage of the proceedings and determined that there was adequate evidence to allow all counts to be submitted to

the jury. The court has now reconsidered the evidence in light of Defendants' post-trial motions and reaches the same conclusion based, in part, on the evidence referenced in the Government's responsive memoranda. *See, e.g.,* 3:09-cr-1174, Dkt. No. 492.[2] The court finds no merit to Defendants' other related arguments for judgment of acquittal or other relief.

## II. MOTION FOR A NEW TRIAL (JUROR MISCONDUCT)

### A. Background

The jury for the consolidated trial in these three actions was selected on April 29, 2010. Trial commenced at 9:30 on the following morning. Trial continued though the following week with argument and instructions concluding late in the afternoon of Thursday, May 6, 2010. The matter was submitted to the jury around 4:00 p.m. on that date, with instructions to first select a foreperson and then begin deliberations. The jury broke for the evening around 5:30 p.m. and recommenced deliberations at 9:00 a.m. on Friday, May 7, 2010. The jury advised the court that it had reached a verdict around 4:30 on Friday afternoon. The jury found all six Defendants guilty on all counts (four Defendants were found guilty on five counts, while two were found guilty on two counts).

During the course of deliberations, the jury sent two notes to the court. The first, on Thursday afternoon, advised the court that the jury could not complete its deliberations by 5:30 p.m., and requested to be excused for the evening. The second, midday on Friday, asked for a lunch break at 12:45.

Following traditional practice, the undersigned entered the jury room following acceptance of the verdict to thank the jurors for their service. Transcript of May 26, 2010 Hearing ("Tr.") at 7.

---

[2] The court carefully considered the appropriate elements during the jury-charge conference and, for the reasons stated on the record at that time, concluded that the charge provided to the jury properly set forth the elements of each offense. Nothing in the post-trial motions has convinced the court that there was any error in the elements charged.

At that point, one juror asked the court what the jury should have done if they had a question about the meaning of a term. Tr. at 8. The undersigned reminded the juror that the written jury instructions provided that jury questions should be directed to the judge in a note signed by the foreperson or one or more members of the jury. The court also stated that jurors were not permitted to consult outside sources such as dictionaries. *Id*. No juror suggested that anyone had violated this restriction. *Id.*[3]

On May 13, 2010, a juror (Juror 1)[4] called the court and spoke with the undersigned's courtroom deputy. Tr. at 9. Juror 1 reported that another juror (later identified as Juror 177) had gone home on Thursday night and looked up some information on the internet which he printed and brought in with him on Friday morning. Juror 1 believed that Juror 177 may have shown this document to three other jurors (later identified as Jurors 59, 185 and 204) prior to commencement of deliberations on Friday morning . Tr. at 9, 11. Juror 1 also advised the courtroom deputy that the majority of jurors refused to look at the document, but that the foreperson (Juror 185) stated he had

--------------------

[3] The court's oral and written instructions to the jury included the following caution:

I remind you that during your deliberations, you must not communicate with or provide any information to anyone by any means about this case. *You may not use any electronic device or media, such as* a telephone, cell phone, smart phone, iPhone, Blackberry or computer; *the internet, any internet device*, or any text or instant messaging service; or any internet chat room, blog, or website such as Facebook, My Space, LinkedIn, YouTube, or Twitter, to communicate to anyone any information about this case or *to conduct any research about this case* until I accept your verdict.

Jury Instructions at 32 (emphasis added).

[4] Here, as during the hearing held May 26, 2010, the court refers to jurors only by their juror number.

looked at it and did not think it related to the case so that it was not improper to consider it.  Tr. at 9.

Upon receipt of this information, the court determined that a hearing should be conducted to determine whether the verdict had been tainted by introduction of extraneous information.  The court issued a hearing notice giving general information as to the reason for the hearing and summoned the jurors.  Through the hearing notice, summonses, and telephonic communications, the court imposed restrictions intended to insure that testimony from the jurors was not tainted prior to the hearing by any research, discussion or other communication.  *See generally* Tr. at 11; Tr. at 4-6 (addressing steps taken before the hearing).

The hearing took place on May 26, 2010.  During the hearing, the court placed the above background information on the record and then took testimony from all twelve jurors.  The court first questioned the eight jurors who Juror 1 indicated had not viewed the extraneous materials.  The three jurors who Juror 1 believed may have viewed the material were questioned next (Jurors 59, 185, and 204).  Juror 177 was questioned last.   The jurors' testimony is summarized below in the order given.[5]

### B.    Juror Testimony

**Juror 155.**  Juror 155 testified that, during the Friday deliberations, Juror 177 reported that he had looked up a definition online.  Tr. at 23-26; Tr. at 29 (stating that she understood Juror 177 had only looked up one word).  Juror 155 did not, however, recall what the word was and did not see any printout or other documentation.  Tr. at 23, 25.  She did, however, recall that Juror 177 shared

---

[5] All questioning was conducted by the court.  Counsel were, however, allowed to confer and hand up additional questions, subject to the restrictions of Fed. R. Evid. 606(b).  Tr. at 11-12 (discussing how questioning would be handled).

the definition orally with the other jurors.  Tr. at 25-26.  Juror 155 explained that she did not pay

much attention to what Juror 177 said, and his proffered definition did not weigh in her decision.

Juror 155 also testified that there had been some discussion about asking the court for a

definition.  Tr. at 25.  She thought the definition Juror 177 brought in may have related to the same

term, although she could not say for sure.  Tr. at 25, 28.  She further testified that she "guessed" the

jury did not seek a definition from the court because they "worked it out on [their] own[.]"  Tr. at

28-29.

**Jurors 260 and 55.**  Neither Juror 260 nor Juror 55 had any recollection of anyone bringing

in any document or sharing a definition from an outside source with the jury.  Tr. at 31-34.

**Juror 224.**  Juror 224 recalled Juror 177 telling the other jurors that he had looked up the

meaning of "Support."[6]  Tr. at 35, 38 (identifying juror).  She did not, however, see any related

document and did not see one being shown to other jurors.  Tr. at 35-36.  Juror 224 explained as

follows: "I wasn't sure why he had looked it up, so it really didn't affect me."  *Id.*; *see also* Tr. at 36

("it didn't register a lot with me").  She did not recall any further discussion of the word and stated

"[i]t was kind of dismissed from what I remember."

**Juror 1.**  Juror 1 reported seeing Juror 177 bring in a document.  She got only a "glimpse"

of the document which she saw "from some distance" and "wasn't able to read."  Tr. at 39.  She

further explained that, during deliberations, when the jury came up with a question about interpreting

---

[6]  Juror 224 is the only juror who believed the word Juror 177 looked up was "support."
Further, as the court noted later in the hearing, "support" does not appear in the jury instruction as
an independent term.  Tr. at 59.  The term "sponsor," by contrast, appears four times and is one of
two words Juror 177 admitted he looked up on the internet.  *Id.*  Under these circumstances, and
considering Juror 224's testimony that any definition proffered by Juror 177 "didn't affect" her, it
seems likely that Juror 224's recollection as to the word at issue was inaccurate.

the jury instructions, Juror 177 "pulled this out and said that he had looked up something on Wikipedia I believe it was the night between deliberations, and most of the jurors immediately said, no, that that was inappropriate and that, you know, we shouldn't discuss it." Tr. at 40. In response to the court's inquiry as to whether Juror 177 said what he had looked up, Juror 1 explained:

> He did not. Another Juror at that time said that he had seen it and that it was okay to look at it because it did not reference the case but it was just related to definitions, and so he thought that it was – it was okay to – that he had looked at it, and because of those reasons he assumed that it was okay for us to use it for consideration. But again, the group as a – the rest of the group said, no, it was still inappropriate and – and he put it away.

Tr. at 40; *see also* Tr. at 41 (indicating her impression that there was more than one definition but she was not sure); Tr. at 42 (identifying Juror 185, the foreperson, as the juror who made these comments).

After this exchange, Juror 177 "folded [the paper] up and put it away and it was not seen or referred to again." Tr. at 44. Nonetheless, he "may have contributed what he . . . learned from" his research during deliberations. *Id.* Later, when asked how Juror 177 may have contributed from his research, Juror 1 testified "He gave an example of what sponsor would mean. . . . He used the example to sponsor a – like if a company were to sponsor a little league team." Tr. at 49. She conceded, however, that she did not know whether this "example came from Wikipedia or just out of his brain." *Id.* (quoting court's inquiry to which Juror 1 gave an affirmative response).

Juror 1 also reported that, earlier in day before the last juror arrived and deliberations could begin, she saw several jurors (she believed it was four jurors) at "one end of the table . . . having discussions." Tr. at 41; *see also* Tr. at 42 (identifying four jurors as 59, 177, 185 and 204). She and other jurors told these jurors they should not be deliberating, to which the jurors at the end of the

table responded that the were "not deliberating," but were, instead, "just trying to get things straight in [their] mind[s]." Tr. at 41; Tr. at 50 (indicating other jurors who may have commented were Jurors 155 and 162). Juror 1 recalled that she, and possibly others, then stated that such discussions were "part of the process" and "should only be done as a group." Tr. at 41. Although Juror 1 thought Juror 177 may have had a paper out at this time, she was "not certain about that" and could not say if "anybody else was exposed to or saw the paper" which she believed reflected Juror 177's internet research. *Id.*[7]

As noted above, Juror 1 asked the jurors at the end of the table to stop their discussions. Tr. at 42. The jurors at the end of the table declined to do so, stating they were not deliberating. At least one other juror who was not involved in the discussions agreed that the discussions were just about "different aspects of things[,]" not deliberations. Although Juror 1 recalled that this juror later stated "now they are deliberating," she indicated that "by that time the final juror had arrived." Tr. at 43.

Juror 1 could not identify the word that had been looked up but speculated that it might have been "sponsor." Tr. at 45 (stating this was "purely speculation" because she did not know what was on the paper); Tr. at 46-47 (noting that she was seated immediately to Juror 177's right when he pulled the paper out, but still saw only that it was a full page of print and did not know if there was more than one page). If anyone else saw the paper, she believed it would be the four jurors who were having discussions at the end of the table although this was only her belief based on the fact they were congregated together at the beginning of the day. Tr. at 45-46.

---

[7] While Juror 1 may have seen Juror 177 with a piece of paper in these early discussions, her understanding of what might have been printed on the paper could only have come from Juror 177's *later* statement that he had done some research and related offer to share the paper with his fellow jurors. As Juror 1 testified, that offer was quickly rebuffed.

Juror 1 indicated that the term "sponsor" was a word the jury discussed while going through the jury instructions. Tr. at 48-49.[8] It was at this point that Juror 177 pulled out the definition and was told to put it away. Tr. at 49. The discussion continued and Juror 177 contributed his understanding of the definition of "sponsor," although Juror 1 did not know whether this contribution came from his research or his preexisting understanding of the meaning of the term. *Id.* As noted above, Juror 177's contribution was to give the example of a company sponsoring a little league team. *Id.*

Juror 1 also indicated that she or other jurors subsequently asked the foreperson, Juror 185, to ask the court for a definition of sponsor. Tr. at 53 (indicating this was "much later in the day"). The foreperson took some initial steps to seek a definition, knocking on the door and confirming with the security officer that it would be appropriate to ask the court for a definition. Tr. at 54. But, "for whatever reason[,] discussions went on and it was not done[.]" *Id.* (stating that she "resolved my own question . . . I satisfied myself because[,] if I had not been able to satisfy myself, I would have . . . pushed it further, but I resolved it by going through some of the . . . exhibits that were in evidence."); *see also* Tr. at 55 (indicating initial dissatisfaction with delay in seeking a definition but then stating "If I had not been able to find something that did satisfy me, . . . I guess I would have had to have pushed it further, but I did find something that satisfied it in my own mind, and . . . nobody else said anything about sending a question out.").

**Juror 34.** Juror 34 was aware that one juror "made a copy of . . . the definition of one word[,]" although Juror 34 "never saw it." Tr. at 60. Instead, when the juror (identified by others

---

[8] Juror 1did not recall the word "exhibit" being of concern to the jury. Tr. at 48. This is the second word which Juror 177 conceded he looked up on the internet.

10

as Juror 177) mentioned he had the definition "we all said something about you're not supposed to bring stuff in," at which point the juror who brought in the definition put it away. Tr. at 60-61 (noting inability to recall name of juror). As Juror 34 recalled, this happened as jurors were arriving the second day and at a point when Juror 34 was sitting beside the juror who brought in the definition. Tr. at 61. When the juror mentioned having gotten the definition off the internet, "several people said, you can't do that . . . so he turned around and put it back in the envelope." Tr. at 62. Although Juror 34 could not see the writing, she thought the word was "sponsor." *Id.*; *see also id.* at 65.

Juror 34 did not recall this juror providing any further information from his definition. Tr. at 63, 65. She did recall a later issue concerning the definition of "sponsor." Tr. at 63. The jury considered asking the court for a definition, but "got on to another area somehow" and never did so. Tr. at 63-64 (indicating she could not recall whether the foreperson decided not to ask, or all the jurors came to an agreement or decided it just wasn't necessary, and also stating that "there was another subject that we were on that was more of an issue").

**Juror 162.** Juror 162 was not aware of anyone bringing in any outside materials for consideration or providing oral information obtained from an outside source. Tr. at 67. Neither did Juror 162 recall any deliberations before other jurors arrived, although she recalled one point when they had to remind themselves to stop watching a video when one of the jurors went to the restroom and conceded that there may have been a "few times" when one or more jurors reminded others not to discuss matters until all were present. Tr. at 68. However, she recalled that any such discussions stopped as soon as the reminder was issued. *Id.* She also recalled that there were

various "side conversations" that went on about what jurors did the night before or planned for the weekend.  *Id.*

Juror 162 also recalled a debate over the meaning of the word "sponsor," and a related discussion with the foreperson about asking the court for a dictionary.  Tr. at 69.  However, the jury "started talking and got past that issue."  Tr. at 69-70.

**Juror 65.**  Juror 65 did not recall anyone bringing in any outside materials for consideration during deliberations or referring to having looked up information and providing that information orally.  Tr. at 71.  She did recall that the jury considered asking the court for the definition of a word, although she could not remember which word was at issue.  Tr. at 72.  As Juror 65 recalled, the jury "got on to something else and [the request for a definition] kind of got lost and never really was discussed again."

**Juror 204.**[9]  Juror 204 was not aware of any juror bringing in outside materials for consideration during jury deliberations but was aware of a discussion of a definition as to which one juror said he looked up a definition online.  Tr. at 74; Tr. at 75 (indicating it was probably Juror 177).  Juror 204 did not, however, recall which word was at issue.  *Id.*  In fact, to his recollection the word and definition were never given, although the juror stated that looking it up "had satisfied [him] . . . to know what it meant."  Tr. at 74-75.  Juror 204 did not believe the whole jury would have heard the comment which was made early on the second day (Friday).  Tr. at 75-76.

---

[9]  Juror 204 and the next two jurors whose testimony is summarized here (59 and 185) are the three individuals Juror 1 identified as being seated at the end of the table and engaged in discussions with Juror 177 on Friday morning before all of the jurors arrived.

Juror 204 also recalled a later discussion of seeking a definition from the court. Tr. at 76. Although he could not recall what word was at issue, he did recall that the jury "decided after reading through [their] material that [they] did not need to ask the court for clarification." Tr. at 76.

**Juror 59.** Juror 59 did not recall anyone bringing in outside materials for consideration during deliberations or indicating he or she had looked something up on the internet. Tr. at 78. Juror 59, similarly, had no recollection of a discussion with Juror 177 about the definition of a term. Tr. at 78-79. Juror 59 did recall the court's instruction that it would be improper to consider outside materials, but could not recall whether there were any comments or discussions relating to this instruction between the jurors. Tr. at 79. He did not hear anyone instruct another juror to put something away because it could not be considered. *Id.*

Juror 59 did recall "several times" when one or more jurors would remind the others that they should not be discussing the case because not all jurors were present. Tr. at 79-80 (noting, as an example, that this occurred when a juror took a restroom break). He conceded that the jurors caught themselves talking about the case several times and would, at that point stop deliberations until all jurors were again present. Tr. at 80.

**Juror 185.** Juror 185 served as foreperson of the jury. Tr. at 81. He conceded that he was aware of a juror bringing in outside materials defining one or more words, although he did not recall the juror's name or the word(s) defined. Tr. at 81-82. Juror 185 testified that the jury was "trying to determine what a particular word meant" and that this juror brought in a definition the next day. Tr. at 82. Juror 185 "looked at [the definition] and decided that it really . . . wasn't a good source [and] really didn't tell [him] anything, so [he] just disregarded it." Tr. at 82 (indicating the definition was printed on one or two sheets of paper and that the source was Wikipedia). Juror 185 also

advised the other juror that "Wikipedia was not valid" or "not a reliable source of information." Tr. at 83-84. This exchange took place outside the jury room, in the lobby of the courthouse, not in the presence of any other jurors. Tr. at 85. However, Juror 185 later testified that one other person may have seen the paper on which the definition was written at some point in the day. Tr. at 84.

During the hearing, Juror 185 briefly reviewed a copy of the jury instruction. After doing so, he stated that the word the other juror had researched may have been "conducts," although he was not certain. Tr. at 83; *see also* Tr. at 92 (expressing doubt as to whether the word was "conducts").[10]

Juror 185 also testified that, later in the day, when the jury was discussing the definition of the relevant term ("conducts"), the juror who had brought in the definition again mentioned that he had it. Tr. at 86. Juror 185 recalls that he again stated that Wikipedia was not a reliable source. *Id.* He also stated that "there were small conversations going on amongst other people." *Id.* Juror 185 testified that it was possible the juror with the definition shared some words from the definition with other jurors at this time, although he could not recall whether this happened. *Id.* He did recall that the definition was not read to the other jurors. *Id.*

Juror 185 did not recall any issue being raised about premature deliberations on Friday morning. Tr. at 87. He did, however, recall that there were several instances when someone would go to the restroom and conversations would continue, resulting in a reminder from other jurors that they needed to wait for the return of the absent juror. *Id.*

Juror 185 recalled a discussion about asking the court for one or more definitions. Tr. at 88. He thought the definition brought in by the juror related to one of the words as to which they had

_____

[10] Later in his testimony, Juror 185 indicated in response to a more pointed question that the definition(s) may have included a definition of the word "sponsor." Tr. at 89.

14

discussed seeking a definition. *Id.* (also conceding that "sponsor" may have been a term defined in the extraneous materials). He believed that the words "manages" and "sponsor" may have been among the words for which the jury considered seeking definitions. He explained the reason no definition was sought as follows: "We ended up not using that particular section of the jury instructions . . . for what we were deliberating on. . . . so then needing the definition of that just became null and void." Tr. at 88; *see also* Tr. at 90 ("we ended up finding a separate section and that was what we used" eliminating the "need [for] that word").

**Juror 177.** After being afforded the opportunity to consult with appointed counsel, Juror 177 elected to testify.[11] Tr. at 95-96. He admitted that he conducted internet research and brought extraneous materials obtained over the internet into the jury room during deliberations. Tr. at 96-97. Although he no longer had the actual materials, he provided the court with two documents which he printed off the internet prior to the hearing using the same steps he had used to produce the materials he brought to deliberations. Tr. at 97-98; 107 (indicating he located the definitions through Google, rather than searching within the Wikipedia or Miriam Webster websites). The first was a three-page document from Wikipedia which included the definition of "Sponsor (Commercial)." The second was a one page document from the "Free Miriam Webster Dictionary" defining the word "exhibit." *Id.* at 95, Court's Exhibit No. 1.

The lengthy definition of "sponsor" (in the form provided at the hearing) begins with the following statement: "To **sponsor** something is to support an event, activity, person, or organization

---

[11] Because of the potential for contempt sanctions, the court appointed counsel for Juror 177. This attorney was allowed to hear the testimony of all other jurors before advising Juror 177 as to whether he should testify. Tr. at 7. The attorney was not, however, allowed to advise Juror 177 as to the content of any other juror's testimony.

financially or through the provision of products or services.   A **sponsor** is the individual or group

that provides the support, similar to a benefactor."   Court's Ex. 1 at 1 (emphasis in original).   The

first sentence following the heading "Definition" reads as follows: "Sponsorship is a cash and/or in-

kind fee paid to a property (typically in sports, arts, entertainment or causes) in return for access to

the exploitable commercial potential associated with the property."   Other situation-specific

variations on the meaning and benefits of commercial sponsorship follow, including references to

use of signage, media coverage, entertainment of clients, and cause-related marketing.   Several

sponsorship organizations and controversies are also discussed.  *Id.* at 1-2.[12]

   The document containing the definition of "exhibit" was apparently a two page document,

although only one page was provided.  Court's Ex. 1 at 4.  The page which was provided, however,

includes the definition of "exhibit" as a verb, which is the form in which the word was used in the

jury charge, and reads as follows:

>   **1**: to submit (as a document) to a court or officer in course of proceedings; *also*: to
>   present or offer officially or in legal form
>
>   **2**: to present to view: as **a**: to show or display outwardly especially by visible signs
>   or actions <exhibit*ed* no fear> **b**: to have as a readily discernible quality or feature
>   < in all cultures we know, men exhibit an aesthetic sense – H.J. Muller> **c**: to show
>   publicly especially for purposes of competition or demonstration   <exhibit a
>   collection of artifacts>

*Id.* (all emphasis in original).[13]

---

[12]   Although the definitions given are consistent with the "Little League" example which
Juror 1 testified was offered by Juror 177, the term "Little League" does not appear in the printout
provided to the court.

[13]   While Juror 177 candidly admitted looking up the terms "sponsor" and "exhibit," he
denied looking up or bringing in information on any other words.  Tr. at 106 (denying that he looked
up "conducts").

Juror 177 admitted that he looked up "sponsor" and "exhibit" on the internet the morning of the second day of deliberations. He also admitted that he brought printouts of these definitions with him to court. Tr. at 98. He explained that he was curious as to whether there was more than one meaning for these words so he "looked it up [but] there was basically nothing." Tr. at 99-100. When he arrived, he saw Juror 185 near the front door of the courthouse and showed him the definitions stating that he had looked up the terms and "it's no different than what we talked about." Tr. at 100. Juror 185 gave the printouts "a rough glance," then Juror 177 put the papers back in his pocket where, he testified, the papers remained until he threw them away at lunch time. Tr. at 100; *see also* Tr. at 101 (stating that Juror 185 commented on the unreliability of Wikipedia).

Although the terms "sponsor" and "exhibit" were discussed throughout the day, Juror 177 stated that he did not provide the information he obtained to any other juror during deliberations. Tr. at 101. Consistent with this statement, he denied recalling any other juror saying that it would be inappropriate to consider outside materials. Tr. at 102. He also denied that he used the definitions which he obtained from the internet in deciding the case. Tr. at 102.

Juror 177 did not recall any specific discussions before all jurors arrived. Tr. at 102. Neither did he recall any controversy or complaint about such discussions. *Id.*

Juror 177 did recall a discussion late on Friday about asking the court to obtain a definition. Tr. at 103. He did not recall which word or words were at issue, but did recall that the issue simply resolved. *Id.*

## C.    Findings of Fact

Having fully considered the above testimony and related records, the court makes the following findings of fact.

17

1.      Following nearly five full days of testimony, argument, and instruction, the jury began deliberations just prior to 4:00 p.m on Thursday, May 6, 2010.  The jury was excused for the evening just after 5:30 p.m. (thus, an hour and a half into deliberations) and returned on Friday morning around 9:00 a.m. to begin deliberations.

2.      Juror 177 unilaterally decided to conduct internet research as to the meaning of two words, sponsor and exhibit, on the morning of this overnight break.  He did so to satisfy his curiosity as to whether there was more than one meaning to the relevant terms, and, after conducting this research, concluded that the meanings were as the jury had understood the terms during their first hour and a half of deliberations.  Juror 177 conducted this research by typing the words at issue into the Google search engine.  From this, he obtained a list of sources for definitions from which he selected the Wikipedia source for "sponsor" and the Free Miriam Webster Dictionary source for "exhibit." The definition he found for "exhibit" was the verb form and read, in essence, as follows:

> **1**: to submit (as a document) to a court or officer in course of proceedings; *also*: to present or offer officially or in legal form
>
> **2**: to present to view: as **a**: to show or display outwardly especially by visible signs or actions <exhibit*ed* no fear> **b**: to have as a readily discernible quality or feature < in all cultures we know, men exhibit an aesthetic sense – H.J. Muller> **c**: to show publicly especially for purposes of competition or demonstration  <exhibit a collection of artifacts>

*Id.* (all emphasis in original).[14]

---

[14]  Because the documents provided to the court were "recreated" after trial, the court cannot determine with certainty that the documents shown in Court Ex. 1 are in precisely the same form and contain precisely the same content as the documents which Juror 177 brought to the deliberations. The court is, nonetheless, persuaded that the definitions found on Court Ex. 1 are in essentially the same form as those brought in by Juror 177, although there has been at least some change to the Wikipedia definition of "sponsor."

The definition Juror 177 found for "sponsor" was lengthy and contained language which, while perhaps not precisely the same as that found in Court's Ex. 1, was essentially as set out below. *See supra* n.14. The definition explained that "[t]o **sponsor** something is to support an event, activity, person, or organization financially or through the provision of products or services. A **sponsor** is the individual or group that provides the support, similar to a benefactor." Court's Ex. 1 at 1 (emphasis in original). The first sentence following the heading "Definition" read as follows: "Sponsorship is a cash and/or in-kind fee paid to a property (typically in sports, arts, entertainment or causes) in return for access to the exploitable commercial potential associated with the property." Other situation-specific variations on the meaning and benefits of commercial sponsorship were also provided, including references to use of signage, media coverage, entertainment of clients, and cause-related marketing. Several sponsorship organizations and controversies are also discussed. *Id.* at 1-2.

3.      Juror 177 brought the printouts to the court on the second day of deliberations and, before entering the jury room, showed them to Juror 185, the foreperson. When he showed the printouts to Juror 185, Juror 177 explained that he thought the definitions were consistent with the definitions the jury had used in its deliberations the previous day. Juror 185 gave the printouts no more than a cursory examination because he thought the Wikipedia source was unreliable and the definitions "really didn't tell [him] anything." He, therefore, "disregarded" the definitions and could not even recall what words were defined when he gave his post-trial testimony.

4.      Jurors 177, 185, 59 and 204, sat together in the jury room and engaged in discussions before all jurors were present. Some of these discussions may have veered into subject matters relating to the case and, therefore, would have constituted deliberations with fewer than all jurors. In the course

of these discussions or at some other point "early on the second day," Juror 177 made a statement that he had looked up a word on the internet. Juror 204 heard this comment but Juror 59 did not. The comment did not, however, go beyond mentioning the fact of the research. Beyond the possibility that Juror 177 mentioned the fact of his research during the small-group conversation on Friday morning (as opposed to mentioning it after the full jury arrived but still "early" in the day), there is no evidence that any premature deliberations by this small group involved the extrinsic materials in any way. Most critically, there is no evidence that Juror 177 shared the *results* of his research during these discussions.

5.     During deliberations, which continued until approximately 4:30 that afternoon,[15] the jury briefly continued review of evidence (*e.g.*, watching a video) or deliberations on one or more occasions when fewer than all jurors were present in the jury room. This occurred when one or more jurors took a restroom break.[16] The jury as a body, however, took corrective action promptly when this occurred, reminding each other that someone was absent and deliberations must cease. There is no evidence that any extrinsic materials or information was discussed during any such continued deliberation with fewer than all jurors.

6.     During deliberations, the jury may have violated the spirit of the instruction to deliberate only as a body by engaging in "side conversations" which involved fewer than all jurors despite all

---

[15] The jury broke for lunch from 12:45 to 2:00 p.m. and reached a verdict by 4:30 p.m. Thus, total deliberation time was less than eight hours with roughly an hour and a half of that time being on the first day of deliberations and six and a half hours on the second day – after Juror 177 conducted his research.

[16] The restrooms are connected to and accessed directly from the jury room, allowing jurors to take a restroom break without the disruption inherent in asking a security officer to escort a juror to the restroom.

jurors being present.  There is no evidence that any extrinsic materials were discussed during any such side conversation except to the extent some jurors may have heard Juror 177 refer to having the definitions to which they responded by advising Juror 177 that these materials could not be considered.

7.      At one or more points during the second (first full) day of deliberations, Juror 177 mentioned to the panel that he had looked up one or more terms online.  His mention was brief, identifying only the term "sponsor."[17]  He was stopped from sharing any written material by other jurors who commented that it would be inappropriate to share the information (although one juror, the foreman, may have commented that the materials were not impermissible because they only related to a definition).   At a later point, Juror 177 may have shared an example which may have been derived from or influenced by his internet research (Juror 1 testimony) or may have orally shared some portion of the definition with the other jurors (Juror 155 and 185 testimony).  Given that the only specific recollection of any contribution by Juror 177 was the Little League sponsorship example recalled by Juror 1, the court concludes that whatever contribution Juror 177 may have made to the discussion was either consistent with the Little-League example or duplicative of meanings offered by other jurors.  The latter conclusion is consistent with Juror 177's statement that the definitions he found on the internet were consistent with the meanings discussed by the jury prior to the

_____

[17]  Only six jurors (Jurors 155, 224, 1, 34, 203, and 185) heard (or paid sufficient heed to recall) any comments by Juror 177 regarding his internet research.  Other than Juror 185, who saw the paper and at least glanced at the content, only two jurors (Juror 1 and 34) testified they saw Juror 177 pull out or attempt to pull out the paper to share the definition.  However, these jurors testified that Juror 177 was told to put the paper away and he did so.  Thus, no jurors other than Jurors 177 and 185 ever read any portion of the content of the printouts.

overnight break.[18]  For purposes of this order, therefore, the court will assume without deciding that Juror 177 was influenced by his internet research to the extent of forming his Little-League example and that he may have spread that influence to other jurors by sharing the example during deliberations.

8.      At some point during the second day of deliberations, one or more jurors suggested seeking one or more definitions  from the court.  One of the words at issue, "sponsor," was also one of the two words for which Juror 177 obtained a definition through internet research.  There is no evidence that Juror 177 (or anything he may have contributed to the discussion) influenced either the request to seek guidance from the court or the ultimate resolution of the case without seeking such guidance. Instead, each member of the jury panel who had concerns regarding the definitions resolved his or her concerns based either on other portions of the jury charge (possibly the aiding and abetting instructions or reliance on the term "exhibits" rather than "sponsors") or based on his or her own understanding of the relevant terms.[19]

9.      Although a few jurors may have understood that Juror 177 researched more than one word, none learned that one of the words researched was "exhibit."   In any event, there is no indication that "exhibit" was subject to any significant discussion such that Juror 177's contribution, if any, as to the meaning of this word would have had any significant impact on the panel.

---

[18]   The Little-League  example, could, nonetheless, have been influenced by Juror 177's internet research as it is consistent with the definition of "sponsor" which he downloaded from Wikipedia (to the extent reflected in Court's Ex. 1).

[19]   It is neither necessary nor reasonable to conclude that all jurors resolved whatever concerns they may have harbored on the same basis.  Further inquiry into this issue is, moreover, precluded by Fed. R. Evid. 606(b).

**D.      Standard**

An extrinsic influence on a jury's deliberations violates a defendant's Sixth Amendment rights to an impartial jury, to confront witnesses against him, and to be present at all critical stages of his trial. *See, e.g., Rogers v. United States*, 422 U.S. 35, 38-40 (1975). "[A]n influence is ... [extrinsic] if it (1) is extraneous prejudicial information; *i.e.*, information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, . . . or (2) is an outside influence upon the partiality of the jury, such as 'private communication, contact, or tampering ... with a juror.' " *Robinson v. Polk*, 438 F.3d 350, 363 (4th Cir.2006) (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

In contrast, "the Sixth Amendment's guarantees do not require judicial consideration of juror allegations regarding influences internal to the deliberation process." *Id.* (discussing long history of rules prohibiting inquiry into allegations of juror misconduct absent allegations of an external influence). As the Ninth Circuit explained in *Fields v. Brown*, 503 F.3d 755, 778-79 (9th Cir. 2007), "Juror testimony about consideration of extrinsic evidence may be considered by a reviewing court, but juror testimony about the subjective effect of evidence on the particular juror or about the deliberative process may not."

The line between intrinsic and extrinsic influences may, however, be a fine line, particularly where the alleged external influence does not relate to evidentiary matters. *See Robinson*, 438 F.3d at 363 (discussing "fine line" in finding state court did not act unreasonably when it upheld a conviction despite juror asking for and bailiff providing a Bible during sentencing deliberations from which juror read the "eye for an eye" passage to panel). In reaching this conclusion, the Fourth Circuit distinguished external sources bearing on evidentiary issues from those consulted for more

general guidance. *Robinson*, 438 F.3d at 363 (noting that "no Biblical passage-including the ones we assume were read-had any evidentiary relevance to the jury's determination of the existence of [the] aggravating and mitigating circumstances" relevant to the sentencing decision). Based on this distinction, the court held: "it would have been reasonable for the [reviewing state] court to conclude that the Bible had no bearing on any fact relevant to sentencing, and was therefore not tantamount to "evidence" that was used against [the criminal defendant] at sentencing." *Id.* The court distinguished outside sources "which impose pressure upon a juror apart from the juror himself" from "reading of Bible passages [which invite] the listener to examine his or her own conscience from within." *Id.* As the court explained, in this context "the Bible is not an 'external' influence [but is, instead,] analogous to the situation where a juror quotes the Bible from memory, which assuredly would not be considered an improper influence.'" *Id*. at 364-64;

*see also Fields*, 503 F.3d at 778-79 (noting as follows, in addressing Bible verses contained in juror's notes: "The Sixth Amendment inquiry in the context of outside influence on a jury is fact-specific. Among other things, it requires a reviewing court to determine whether the particular materials that a juror brought into the jury room are extraneous materials, or are merely 'the kind of common knowledge which most jurors are presumed to possess.'")

Although it does not relate to evidentiary matters, a juror's consultation of a dictionary (without proper judicial approval and related controls) "constitutes an external, rather than an internal, influence." *See McNeill v. Polk*, 476 F.3d 206, 225-226, (4th Cir 2007) (J. King concurring in part and dissenting in part); *id.* at 228 (J. Gregory concurring in part and dissenting in part).[20]

_____

[20] Both Judges King and Gregory would have reached the question of whether the verdict was tainted by juror misconduct and both would have applied the same test. To this extent, their combined opinions represent the majority opinion. These two judges differed, however, with regard

24

As noted in *McNeill*, since at least 1979, the Fourth Circuit has recognized that consultation of a home dictionary constitutes an external influence. *McNeill*, 476 F.3d at 226 (citing *United States v. Duncan*, 598 F.2d 839, 866 (4th Cir.1979)).

Such misconduct is not, however, prejudicial *per se*. *McNeill*, 476 F.3d. at 225 (J. King); *see also id.* at 228 (J. Gregory stating in partial dissent that where the "consultation involves the legally defined concept that is the crux of the sentencing process, [the court] should investigate its potential for prejudice as thoroughly as possible"). As the Fourth Circuit explained in *Duncan*:

> [A] juror's reference to a dictionary . . . is not deemed prejudicial *per se*. . . . Other courts have agreed that a juror's use of a dictionary is not an event that is inherently prejudicial. *See, e.g., United States v. Henley*, 238 F.3d 1111, 1115-16 (9th Cir. 2001) (observing that certain juror misconduct, including use of dictionary definition, constitutes "more common and less pernicious extraneous influence on jury deliberations" than other more serious misconduct, such as attempted bribery). And it is generally accepted that, although a juror can testify that she consulted an extraneous influence and related her findings to the panel, neither she nor any other juror can testify about any effect the extraneous influence may have had on the verdict or on the jury deliberations. *See* Fed. R. Evid. 606(b); *Mayhue v. St. Francis Hosp., Inc.*, 969 F.2d 919, 921 (10th Cir.1992).

*Id.* at 866 (also noting that the "circumstances in which juror misconduct can occur are probably as varied as all of human experience.").[21]

_____

to whether the defendant-petitioner was entitled to a hearing to determine whether the alleged misconduct was prejudicial. Judge Gregory believed an evidentiary hearing was necessary to afford defendant an opportunity to establish that a juror "did bring in a dictionary definition of mitigate, that other jurors consulted or discussed that definition, and that the jury concluded its deliberations shortly after the introduction of the non-legal definition." *Id.* at 230-31. In Judge Gregory's opinion, such evidence would be sufficient to "prove prejudice without violating the federal rule and the principle that a juror's deliberative process is inviolable." *Id*. In the present case, this court has taken testimony from all jurors, thus following the approach suggested by Judge Gregory.

[21] In *Duncan* the Fourth Circuit affirmed the trial judge's decision not to inquire further into a juror's reference to dictionary definitions of "motive" and "intent" during deliberations where the foreman "only mentioned the dictionary incident as an aside while reporting on the other possible instance of misconduct" and also "related that he had immediately squelched all discussion of the dictionary definitions" as soon as they were mentioned. *Id.*

Although the two concurrences in *McNeill* differ as to the degree of investigation warranted, both agree that the court should determine whether there has been prejudice by considering the factors set forth in *Mayhue v St. Francis Hospital of Wichita, Inc.*, 969 F.2d 919 (10th Cir. 1992):

> (1) The importance of the word or phrase being defined to the resolution of the case. (2) The extent to which the dictionary definition differed from the jury instructions or from the proper legal definition. (3) The extent to which the jury discussed and emphasized the definition. (4) The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition. (5) Any other factors that relate to a determination of prejudice.

*Mayhue*, 969 F.2d at 924 (quoted in *McNeill* at 226 (J. King), 229 (J. Gregory)). As Judge King further explained, "there is no Supreme Court authority clearly articulating the specific circumstances under which an extraneous influence might prejudice a juror, and 'each case must turn on its special facts.'" *Id.* at 226 (quoting *Marshall v. United States*, 360 U.S. 310, 312 (1959)).

### E.    Conclusions of Law

**1.    Deliberations with Fewer than All Jurors.**  The alleged premature deliberations by a group of four jurors, brief continuation of deliberations while one or more jurors were in the restroom, and "side conversations" between fewer than all jurors despite all jurors being present are relevant to this motion only to the extent these deliberations or conversations may have involved discussion of the extraneous material or information brought in by Juror 177.  Absent discussion of extraneous material or information, any "misconduct" inherent in deliberations with fewer than all jurors present constitutes intrinsic misconduct which is beyond the scope of proper judicial inquiry.  *See generally* Fed. R. Evid. 606(b); *Robinson*, 438 F.3d at 363.  Even if the court could consider such alleged intrinsic misconduct, it would find no resulting prejudice as it is clear that the jurors reminded themselves of their duties and promptly ceased any inappropriate discussions when they realized that fewer than all jurors were present.

**2.      Failure to Seek Definition from the Court**.  For the same reasons stated above as to premature deliberations, the court's inquiry into the foreperson's failure to seek a definition from the court after a request was made by one or more jurors is limited to determining whether this failure was the result of an improper external influence: specifically, the availability of the definition procured by Juror 177.   While there is some indication that Juror 177 made a contribution to the discussion of the relevant term which may have been influenced by his improper research through external sources, there is no indication that this contribution in any way influenced the decision not to seek a definition from the court.  To the contrary, all jurors who addressed this issue testified that the decision not to seek a definition from the court was based on the jury having reached a consensus that obviated the need for further definition of the relevant term.   Thus, there is no basis for concluding that the discussion of and decision relating to whether to seek a definition from the court were influenced in any way by an external influence.

**3.      Discussion in the Presence of  Fewer than All Jurors Relating to Extrinsic Material.** Only one discussion occurred which related to the content of the extrinsic definitions and took place in the presence of fewer than all jurors.  This discussion, between Jurors 177 and 185, occurred outside the jury room and represents misconduct at least on the part of Juror 177, who violated the court's instructions by obtaining the definitions and by presenting them to another juror.  To a lesser extent it represents misconduct by Juror 185 who should have refused to look at the materials and, arguably, should have advised Juror 177 that it was improper both to obtain such materials and to seek to engage in a discussion of the case (or anything relating to the case) except in the presence of all jurors.  Juror 185 also, arguably, should have reported Juror 177's misconduct to the court.

That this misconduct occurred is not, alone, sufficient to require a new trial. It does, however, require the court to consider whether the discussion was or had the potential to be prejudicial. This requires consideration of the five *Mayhue* factors which are discussed below. *Infra* Conclusions of Law ¶¶ 5-9.

**4.      Discussions in the Presence of All Jurors but Involving or Remembered by Only Some Jurors.** In addition to the above-referenced discussion between Juror 177 and 185, there was at least one other occasion when Juror 177 referenced the externally obtained definition. While all jurors were then present, only six jurors remember any comment by Juror 177 relating to the matter and only three recalled that he may have contributed some content, as opposed to simply stating that he had done research. Only one recalled any actual content contributed: the Little-League example discussed above.[22] As with the pre-deliberation discussion between Jurors 177 and 185, the court finds this evidence sufficent to require analysis of the *Mayhue* factors.

*Mayhue* Factors

**5.      The importance of the externally defined words to the resolution of the case.** Both of the words for which Juror 177 obtained definitions from an external source, "exhibit" and "sponsor," were important to the case as they formed part of the elements of two of the offenses. Thus, an improper definition of these terms could, potentially, have been prejudicial to Defendants.

---

[22]   The differences in recollection may suggest that multiple individuals were speaking at the same time, that some jurors were more attentive than others as regards Juror 177's comments; or that Juror 177's comments were made in such a manner that they could be heard only by some jurors. In any event, the differences do not suggest misconduct or improper external influence.

**6. The extent to which the external definition differed from the jury instructions or from the proper legal definition.**

   **a.    Exhibit.** There is no evidence that the definition of "exhibit" which Juror 177 obtained from the internet was ever introduced into the jury discussion. To the extent it may, nonetheless, have been considered by Juror 177 (or Juror 185 who had an opportunity to see the printout of the external definitions), the court finds that the definition shown on Court's Ex. 1 is not significantly different from any definition the court might have provided. *See* Court's Ex. 1 (quoted *supra* Findings of Fact ¶ 2). The court further notes that "exhibit" is not a term having a particular "legal" definition. Instead, the statute appears to intend the common meaning of the term.

   **b.    Sponsor.** The definition of "sponsor" shown on Court's Ex. 1 is largely inapplicable to the charges in this action given its focus on commercial sponsorship and discussion of various peripherally related topics. *Id.* Nonetheless, the essence of the definition is that one may "sponsor" an event by providing funding, in-kind services, or a venue to facilitate the occurrence of the event. Given Juror 177's Little-League example, this is the meaning Juror 177 appears to have taken from the lengthy definition and related discussion. Moreover, this "essence," including as expressed in Juror 177's example, is consistent with the definition the court would have provided had it been asked for a definition. Finally, as noted above with respect to the term "exhibit," the underlying statute does not appear to intend that "sponsor" have any particular legal definition distinct from common usage.

   There is one additional concern with the definition of "sponsor" obtained by Juror 177, which is that it came from Wikipedia. As Defendants note, definitions on Wikipedia are subject to change by users, and the definition at issue (of "sponsor") had, according to Court's Ex. 1, been changed

between the time Juror 177 consulted this external source and when he repeated the same steps to produce Court's Ex. 1. The court must, therefore, assume that the definition of "sponsor" shown in Court's Ex. 1 is different in at least some respects from what Juror 177 obtained and consulted during deliberations. Given the meaning which Juror 177 seems to have derived from the definition (as evidenced by his example), however, the court concludes that any meaning germane to this action which may be drawn from the definition has remained unchanged.

**7.     The extent to which the jury discussed and emphasized the definition.** Juror 177 showed both definitions to Juror 185 before either entered the jury room on the morning of the first full day of deliberations. When he offered the printout to Juror 185 for examination, Juror 177 stated that the definitions he found were consistent with the meanings the jury had already used in its earlier deliberations. Thus, Juror 177 himself gave little emphasis to the definitions. Juror 185 gave them even less emphasis as evidenced by his affirmative dismissal of the source as unreliable, his testimony that the definition he saw did not tell him anything and that he "just disregarded it," and his failure to accurately recall even what word or words were defined.

The only other jurors who were made aware of Juror 177's external research recalled only his reference to the word "sponsor." The jurors (other than Juror 185) who recalled Juror 177's offer to share his external research immediately cut off any discussion by advising Juror 177 that he should not have conducted outside research and the jury should not consider it. With one exception, the few jurors who recalled that Juror 177 *might* have contributed something to the discussion of the meaning of "sponsor" could not recall what his contribution was and, in at least one case, stated that the juror "disregarded" that contribution. This suggests that any contribution by Juror 177 was either no different than the other juror's own independent understanding of the term or was given little

consideration. Only Juror 1 recalled a specific contribution, the Little-League example. Whether this example was read or quoted from the external definition, or an example based on Juror 177's external research,[23] it constitutes the only evidence that Juror 177 shared or was influenced by any information gleaned through his internet research. Under these circumstances, the court finds that there was no more than a mention of a single excerpt from the definition of sponsor (or example drawn from that definition) which might have influenced the jury in any way. Further, as noted above, this example was consistent with the definition the court would have provided if requested.

8. **The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition.** As explained in the Government's responsive memoranda,[24] the evidence against each of the Defendants in the consolidated trial was strong. The most significant area of dispute related to whether the Government had shown an adequate connection to interstate commerce to support imposition of a federal penalty for activities the Defendants conceded they knew were illegal under state law. As to the definitions of "sponsor" and "exhibit," it is significant that each of the Defendants could be convicted not only for his or her own activities, but (depending on the charge) for conspiring with or aiding and abetting others in exhibiting or sponsoring an animal in an animal fighting venture. There was strong evidence both of conspiracy and aiding and abetting as to each of the Defendants tried. *See generally supra* § I.

---

[23] The latter seems more likely given that this example does not appear in Court's Ex. 1. However, as this definition was apparently changed between the time consulted by Juror 177 (during deliberations) and the hearing, the court will assume such an example may have appeared in the Wikipedia definition when consulted by Juror 177.

[24] The Government filed a separate memorandum in opposition to the motions for new trial in each of the above captioned actions. All three memoranda are, however, identical as to content.

**9.     Any other factors that relate to a determination of prejudice.**

As noted above, Juror 177 himself characterized the definitions he found on the internet as consistent with the jury's understanding on the first day of deliberations. Those deliberations had lasted only an hour and a half and there is no basis for concluding that any juror other than Juror 177 at that point felt the need to procure a definition. Even Juror 177 conceded he only did the research to satisfy himself that there was not some other meaning.

### F.     Conclusion as to Motion for New Trial

For the reasons set forth above, the court concludes that there was Juror misconduct in that Juror 177 conducted internet research as to the terms "sponsor" and "exhibit" and shared or attempted to share the information he gleaned from that research as to one of the terms ("sponsor") with one or more other jurors. This constitutes an improper external influence but is not prejudicial per se. Having fully considered the evidence, the court finds no reasonable possibility that the external influence caused actual prejudice. Defendants' motions for a new trial on this ground are, therefore, denied.

## CONCLUSION

For the reasons set forth above, Defendants' motions for judgment of acquittal or, alternatively, a new trial are denied.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
July 19, 2010